# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### MISSOULA DIVISION

| | |
|---|---|
| DOUGLAS JOSEPH CHYATTE, | CV 13-174-M-JCL |
| Plaintiff, | |
| vs. | ORDER |
| MISSOULA COUNTY, et al., | |
| Defendants | |

This matter is before the Court on the Defendants' Motions for Summary Judgment (Docs. 36, 41) and Plaintiff Douglas Chyatte's Motion to Compel (Doc. 53.) Summary Judgment will be granted as to Defendant Munsell, Chyatte's claim of denial of medications for the first two months of his incarceration at the Missoula County Detention Facility (MCDF), and his denial of Celebrex claim. Although there may be a genuine issue of fact regarding whether Chyatte's rights under the Americans with Disabilities Act (ADA) were violated, he is not entitled to any form of relief under the ADA and therefore those claims will be dismissed. All other motions will be denied.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." The movant bears the

initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, which it believes demonstrate

the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). Once the moving party has satisfied its burden, the non-moving

party must go beyond the pleadings and designate by affidavits, depositions,

answers to interrogatories, or admissions on file, "specific facts showing that there

is a genuine issue for trial." *Id.* at 324. In deciding a motion for summary

judgment, the Court views the evidence in the light most favorable to the

nonmoving party and draws all justifiable inferences in the non-moving party's

favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Court must grant summary judgment "if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed.R.Civ.P. 56(a); *Washington Mutual Inc. v. U.S.*, 636 F.3d

1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is

disputed or undisputed, must be supported by (1) citing to particular parts of

materials in the record, including but not limited to depositions, documents,

declarations, or discovery; or (2) showing that the materials cited do not establish

the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed.R.Civ.P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, although it is not required to do so. Fed.R.Civ.P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

A fact is material if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A defendant does not bear the burden of proof at trial and in moving for summary judgment, he need only prove an absence of evidence to support the plaintiff's case. *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If a defendant meets his initial burden, the burden then shifts to the plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp.*, 627 F.3d at 387 (*citing Celotex Corp.*, 477 U.S. at 323). This requires a plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted). The Court must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted). The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Chyatte's filings because he is a pro se prisoner. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

By contemporaneous notices provided April 7, 2015 (Doc. 39) and April 10, 2015 (Doc. 48), Chyatte was advised of the requirements for opposing motions brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc ); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

## II. COUNT IV–DENIAL OF MEDICAL CARE

### A. Medical Care Allegations

Chyatte was first incarcerated at MCDF on February 3, 2012. In Count IV

of the Amended Complaint, Chyatte alleges Spectrum Medical, Nurse Tim Stahl, PA-CR Trudeau, FNP Munsell, Missoula County, and Captain Kowalski denied him access to his prescription medications for two months pending receipt of his medical records. He alleges he was not seen by Spectrum medical personnel until two months after his arrival at MCDF when he was seen by Defendant Munsell.[1] Chyatte was informed that he could receive Gabapentin[2] but not Celebrex[3] because it was too expensive. He was prescribed Meloxicam instead of Celebrex. He contends that Meloxicam was not as effective as Celebrex and therefore he was forced to exist in a state of excruciating pain with unchecked joint swelling accompanied by irreversible joint damage and further loss of range of motion. (Amended Complaint, Doc. 9 at 12-13.)

Chyatte alleges he made many requests for his proper medication but all were ignored. He finally filed a grievance complaining of deliberate indifference

---

[1]Chyatte has admitted that he misidentified FNP Munsell in the Amended Complaint. (Motion to Amend Reply Brief, Doc. 56 at 5.) As such, Defendant Munsell will be dismissed.

[2]Drugs.com indicates that Gabapentin (Neurontin) is an anti-epileptic medication used to treat nerve pain. http://www.drugs.com/gabapentin.html accessed 9/15/2015.

[3]Drugs.com indicates that Celebrex is a nonsteroidal anti-inflammatory drug (NSAID) used to treat pain or inflammation caused by many conditions such as arthritis, etc. http://www.drugs.com/celebrex.html accessed 9/15/2015.

to his serious medical needs and in response Defendant Nurse Tim Stahl abruptly terminated all of Chyatte's medications.  As a result of the abrupt stoppage he asserts he experienced numerous side effects from detoxification from Mirtazapine (an anti-depressant) namely symptoms of psychosis, suicidal ideations, cognitive disorganization, and severe debilitating depression.  He alleges his requests for treatment were ignored and Defendants failed to monitor him for adverse side effects from the abrupt medication stoppage.  (Amended Complaint, Doc. 9 at 13.)

He alleges that Spectrum Medical employed neither a physician, psychiatrist, or psychologist during his incarceration.  Rather, his health care at the MCDF was provided by "corrections health care technicians" with "spotty, intermittent supervision by an off-site PA."  He contends this amounts to a policy of deliberate indifference.  (Amended Complaint, Doc. 9 at 14.)

### B.  Exhaustion of Administrative Remedies

Defendants first argue that Chyatte failed to properly exhaust his administrative remedies with regard to the discontinuation of his medications on April 20, 2012.  (Spectrum MSJ, Doc. 37 at 5; Missoula MSJ, Doc. 42 at 24.) Chyatte contends he filed grievances and has exhausted his remedies.

The Prison Litigation Reform Act ("PLRA")'s exhaustion requirement states:

> [n]o action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Porter v. Nussle*, 534 U.S. 516, 524-25 (2002);

*Booth v. Churner*, 532 U.S. 731, 741 (2001). This means a prisoner must

"complete the administrative review process in accordance with the applicable

procedural rules, including deadlines, as a precondition to bringing suit in federal

court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Exhaustion is mandatory.

*Booth,* 532 U.S. at 741; *Jones v. Bock*, 549 U.S. 199, 211 (2007). Under the

PLRA, prison regulations define the exhaustion requirements. *Jones*, 549 U.S. at

218.

The proper procedural device for determining whether administrative

remedies have been exhausted is a motion for summary judgment. *Albino v. Baca*,

747 F.3d 1162, 1168 (9th Cir. 2014) (en banc). The determination of whether a

defendant has proved a failure to exhaust is governed by the following burden-

shifting regime:

> a defendant must first prove that there was an available administrative
> remedy and that the prisoner did not exhaust that available remedy.
> Then, the burden shifts to the plaintiff, who must show that there is
> something particular in his case that made the existing and generally
> available administrative remedies effectively unavailable to him by
> showing that the local remedies were ineffective, unobtainable,

unduly prolonged, inadequate, or obviously futile. The ultimate
burden of proof, however, remains with the defendants.

*Williams v. Paramo*, 775 F.3d 1182, 1190-1191 (9th Cir. 2015) (internal

quotations and citations omitted).

Therefore, the defendant must produce evidence showing that a remedy is

available "as a practical matter," that is, it must be "capable of use; at hand."

*Albino*, 747 F.3d at 1171. The Court should consider what "information [was]

provided to the prisoner concerning the operation of the grievance procedure."

*Brown*, 422 F.3d at 937. This information "is pertinent because it informs [the]

determination of whether relief was, as a practical matter, 'available.' " *Id.*

Defendants contend they are entitled to summary judgment because Chyatte

did not avail himself of the procedures purportedly available to grieve the

discontinuance of his medications on April 20, 2012.

Chyatte, however, filed a declaration indicating that he filed a grievance

after Spectrum discontinued his medications but it was ignored and he tried to go

without his medications. (Second Declaration, Doc. 59 at 4, ¶¶ 31-33.) He also

argues that he filed a second grievance on July 18, 2012 which was granted,

thereby exhausting the administrative remedies available to him.

Because there exists a genuine issue of material fact regarding whether

Chyatte filed a grievance following the April 20, 2012 stoppage of his medications, summary judgment may not be granted to Defendants.

## C.  Denial of Medical Care

As a pretrial detainee at all times relevant to his Complaint, Chyatte's claims that he was denied medical care arise under the Due Process Clause of the Fourteenth Amendment and not under the Eighth Amendment prohibition against cruel and unusual punishment.  *Carnell v. Grimm*, 74 F.3d 977, 979 (9th Cir. 1996).  But "the due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes:  'persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs.' " *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (*citing Carnell*, 74 F.3d at 979).

To state a § 1983 claim for failure to provide medical care, including mental health care, a prisoner must allege a defendant's "acts or omissions [were] sufficiently harmful to evidence a deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Toussaint v. McCarthy*, 801 F.2d 1080, 1111 (9th Cir. 1986).  In the Ninth Circuit, the test for deliberate indifference to medical needs is two-pronged:  (1) "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition

could result in further significant injury or the unnecessary and wanton infliction of pain"; and (2) "the plaintiff must show the defendant's response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012)(quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

### 1. Serious Medical Need

With regard to the first prong, the existence of an injury that a reasonable physician would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities, and/or the existence of chronic or substantial pain are indications of a serious medical need. *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted).

Chyatte testified that a Dr. Loess confirmed his diagnoses of lupus and rheumatoid arthritis, prior to his incarceration at MCDF. He contends the lupus and arthritis became serious health problems for him in the early months of 2011. By the early spring of 2011 he was using a walking stick and/or cane. In June 2011, his condition had deteriorated to the point that a physician insisted he use a wheelchair. (Chyatte Declaration, Doc. 62 at 3.)

Chyatte alleges that upon his arrival at MCDF he was given a walker but shortly thereafter needed a wheelchair because of the alleged lack of adequate

medical care. (Declaration, Doc. 62 at ¶ 26.) He asserts Spectrum failed to perform necessary blood tests and a physical examination. (Declaration, Doc. 62 at ¶¶ 30, 32; Lab results, Doc. 62-1 at 6.) Ultimately, he was apparently examined by William Stratford, M.D., who verified that Chyatte suffered from lupus and rheumatoid arthritis. Chyatte also contends that in December 2012 he was seen by PA-C Scott Meissner who also verified that he has lupus and arthritis. (Declaration, Doc. 62 at ¶ 40; Medical charges receipt, Doc. 62-1 at 10.)

Upon his subsequent transfer to Montana State Prison (MSP), Chyatte contends his diagnosis of lupus and arthritis was again confirmed by medical personnel and he asserts he is being treated for lupus and arthritis at MSP with Celebrex and cycles of Prednisone. (Declaration, Doc. 62 at ¶¶ 10, 12-13.)

Defendants challenge Chyatte's assertion of a serious medical need, arguing that Chyatte's test results and medical records do not confirm lupus or arthritis. (Spectrum SUF at ¶ 26, Doc. 38 at 6 citing Stahl Affidavit, ¶ 32, Doc. 38-2 at 6.) The progress notes of Spectrum's PA Scott Meissner indicate that Chyatte's "sed rate" was being tested (Doc. 38-2 at 19–progress note for March 2, 2012 stating "sed rate/CMP pending") but there is no indication what were the results of those tests. Spectrum does not substantiate the basis for Defendant Stahl's statement that Chyatte's test results and medical records do not confirm lupus or arthritis.

Chyatte, in contrast, has presented a lab report that states the test for sed rate was "cancelled by lab, specimen was not received MCDF notified." (Lab report, Doc. 57-5 at 3.) He also presented the following evidence from other medical facilities which he argues indicate a diagnosis of lupus and/or arthritis: (1) medical reports from Hazelden (a drug and alcohol treatment facility) stating, "Perhaps, he should see a rheumatologist here; he has active rheumatoid arthritis" (Hazelden report, Doc. 57-3) and that he has rheumatoid arthritis and/or lupus (Hazelden records, Doc. 2-1 at 1-3); (2) medical records from Ocala Community Care (Doc. 58-4) where he received care while he was incarcerated in Florida showing a diagnosis of rheumatoid arthritis and a four-day cycle of Prednisone which Spectrum was aware of because their own progress notes (Doc. 38-2 at 19) indicate Chyatte completed a Prednisone taper on January 8, 2012, prior to his incarceration at MCDF; (3) records from MSP showing he received accommodations based upon his lupus condition (Doc. 58-7 at 3; 58-8 at 1) and that he has been prescribed Celebrex (Doc. 58-4); and (4) a medical co-pay charge receipt dated December 29, 2012 indicating he was charged for a visit while at MCDF regarding rheumatoid arthritis and lupus (Doc. 58-9 at 2). These records and particularly the representations that Chyatte was treated with Prednisone in Florida and at Montana State Prison (Doc. 59 at ¶¶ 81-82) create a genuine issue

of material fact regarding whether a reasonable doctor would find the presence of a medical condition that significantly affects an individual's daily activities and/or the existence of chronic or substantial pain.

Moreover, it appears that while at MCDF, Chyatte was given medications (Meloxicam, Ibuprofen, and Neurontin) to treat his arthritis and/or lupus. There is nothing in the record to indicate that these medications were prescribed for anything other than lupus and/or arthritis.

Defendants present a number of facts suggesting that Chyatte does not suffer from arthritis or lupus. But on summary judgment, the Court must construe the facts in the light most favorable to Chyatte. In light of the treatment provided to Chyatte prior to his incarceration at MCDF, the medical records presented by Chyatte, the lack of tests and examinations of Chyatte while at MCDF, and the records Chyatte presented demonstrating current treatment, for purposes of this motion, the Court cannot say Chyatte did not suffer from the serious medical conditions of lupus and/or rheumatoid arthritis.

## 2. Deliberate Indifference

The second prong of the deliberate indifference to a serious medical need standard requires a showing of: "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."

*Wilhelm*, 680 F.3d at 1122 quoting *Jett*, 439 F.3d at 1096. "Such indifference may be manifested in two ways. It may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Hutchinson v. U.S.,* 838 F.2d 390, 394 (9th Cir. 1988)(citing *Estelle*, 429 U.S. at 104-05). Deliberate indifference may also be found where the reason for the defendant's action or inaction is unrelated to the prisoner's medical needs. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012)(overruled on other grounds *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014); *Jett*, 439 F.3d at 1097 (citation omitted). A complete denial of medical care is not required to show deliberate indifference. *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000). Allegations that treatment has been requested and denied because of a difference of opinion with medical staff, absent more, are insufficient to state a claim for deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. *Snow*, 681 F.3d at 985 (citation and quotation marks omitted); *Wilhelm*, 680 F.3d at 1122.

Chyatte first alleges he was denied medications for two months while MCDF awaited receipt of his medical records. The undisputed facts are that beginning on February 3, 2012, Chyatte received the following medications:

Mirtazapine (Remeron) 30 mg, Ranitidine 150 mg, and Meloxicam (Mobic) 7.5 mg. (Spectrum SUF, Doc. 38 at ¶ 9.) It is not clear from the record whether these medications were prescribed by Spectrum officials or whether Chyatte brought them with him when he was transferred to MCDF from another jail. Chyatte's February 9, 2012 grievance indicates that he brought approximately a one-month supply of medications into MCDF with him. (Grievance, Doc. 59-5 at 2.) Immediately prior to his incarceration in MCDF, Chyatte was incarcerated in Florida and received care from Ocala Community Care. Spectrum's progress notes indicate that a review of the medical records from Ocala Community Care showed that Chyatte completed a Prednisone taper on January 8, 2012, that he also received Meloxicam (Mobic) 7.5 mg and Mirtazapine (Remeron) 30 mg, and that no other medications were prescribed. (Spectrum SUF, Doc. 38 at ¶ 11.) No medical records have been submitted to support this statement. Chyatte has filed a one-page record from Ocala Community Care showing that on January 13, 2012 he was prescribed Remeron and Naproxen and received a four-day cycle of Prednisone beginning on January 18, 2012. (Ocala medical record, Doc. 59-5 at 1.)

Chyatte's Medication Administration Records from MCDF indicate that he

received Meloxicam (Mobic);[4] and Ranitidine[5] from February 3, 2012 until March 11, 2012. He received Mirtazapine (Remeron)[6] from February 3, 2012 until April 20, 2012 and he was started on Neurontin (Gabapentin) on March 27, 2012. (Doc. 38-2 at 10.) He received Ibuprofen from February 5 through February 10, 2012. (Doc. 38-2 at 8).

Defendant Stahl testified that Chyatte was seen on March 27, 2012 and Meloxicam (Mobic) was stopped because Chyatte indicated it was ineffective. (Stahl Affidavit, Doc. 38-2 at 4, ¶ 15.) But the medication administration record seems to indicate that the Meloxicam was stopped on March 11, 2012 (possibly because the medication ran out as there is a note on the medical record which states: "Out of 3-11-2012"). (Medication Administration Record, March 2012,

_____

[4]Defendants represent that Meloxicam (Mobic) is a NSAID used to relieve pain. (Spectrum SUF at ¶ 16.) Drugs.com indicates that Mobic (Meloxicam) is a NSAID used to treat pain or inflammation caused by osteoarthritis or rheumatoid arthritis. http://www.drugs.com/mobic.html accessed 8/25/2015.

[5]The parties do not indicate why Chyatte received the drug Ranitidine. Drugs.com indicates that Ranitidine is used to treat and prevent ulcers in the stomach and intestines. It also treats conditions in which the stomach produces too much acid, such as Zollinger-Ellison syndrome. Ranitidine also treats gastroesophageal reflux disease (GERD) and other conditions in which acid backs up from the stomach into the esophagus, causing heartburn.

[6]Drugs.com indicates that Mirtazapine (Remeron) is an antidepressant used to treat major depressive disorder. http://www.drugs.com/mirtazapine.html accessed 9/1/2015.

Doc. 38-2 at 10.)  Regardless, when Chyatte was seen on March 27, 2012, Meloxicam was stopped and he was started on Neurontin (Gabapentin) 300 mg. (Stahl Affidavit, Doc. 38-2 at ¶¶ 15-16.)  Defendants represent the change was made because Chyatte claimed Meloxicam (Mobic) was ineffective.  Chyatte was continued on these medications until April 20, 2012 when all of his medications were discontinued.  (Spectrum SUF, Doc. 38 at ¶ 20.)

Based upon a review of the record, it thus appears that Chyatte did not receive pain medication from March 11, 2012 (when his Meloxicam ran out) until March 27, 2012 when he was prescribed Neurontin–a period of approximately 16 days.  Chyatte has presented no evidence to suggest that he complained about the denial of Meloxicam during these 16 days, that his health was at risk during these 16 days, or that he suffered further injury.  A short denial of medications because a medication has run out and there being no evidence that a request for additional medication was made, is insufficient to state a claim for deliberate indifference. *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (where the prisoner is alleging that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay led to further injury).

Chyatte's claim that he was denied Celebrex or even Prednisone (which was not raised in Chyatte's pleading) is insufficient to state a federal claim for

deliberate indifference to a serious medical need.  Even if this was not the medical care that Chyatte expected or wanted, the most that demonstrates is a difference of opinion between medical providers.  A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim.  *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Toguchi v. Chung*, 391 F.3d 1051, 1057-60 (9th Cir. 2004) (a prison official acts with deliberate indifference only if he or she knows of and disregards an excessive risk to the prisoner's health; negligence and a mere difference in medical opinion are insufficient).

In order to prevail on this claim, Chyatte needed to present evidence demonstrating "that the course of treatment the doctors chose was medically unacceptable under the circumstances  . . .  and  . . .  that they chose this course in conscious disregard of an excessive risk to plaintiff's health."  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).  Chyatte has not done so.  Consequently, his claims regarding being denied Celebrex or other drugs of his choice for the period of February 3, 2012 until April 20, 2012 will be denied.

There does, however, appear to be a genuine issue of material fact regarding

the discontinuation of all of Chyatte's medications from April 20, 2012 until July 20, 2012. These medications were allegedly discontinued because Chyatte was "cheeking" or failing to swallow medications. Chyatte denies he was cheeking. Rather, Chyatte contends he filed a grievance on February 9, 2012 against Spectrum for over-charging for medications and not providing him his prescribed medications and Spectrum allegedly retaliated by lodging a false "cheeking" allegation against him. (Chyatte Second Declaration, Doc. 59 at ¶ 90.) He states he met with Spectrum's PA on March 27, 2012 and was told he would not receive Celebrex. Chyatte protested and threatened to hire an attorney. (Chyatte Second Declaration, Doc. 59 at 10, ¶ 97.) According to Chyatte, his medications were discontinued in response to his complaints about Defendants' failure to provide him with proper medical care.

There thus exists a genuine issue of material fact as to the objective prong of the deliberate indifference claim; i.e., whether or not Chyatte's medications were discontinued in retaliation for voicing concerns about his medical treatment.

The Court recognizes that deference in the administration of a prison, especially in light of the needs to preserve discipline and maintain internal security, should be given. *Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2010). Thus, the practice of discontinuing pain medication for inmates accused of

"cheeking" may be in furtherance of such goals. Defendants cite to a number of cases which have found that it is not deliberately indifferent to discontinue pain medication as a consequence of "cheeking" that medication. But in many of the cited cases, the medication being "cheeked" is one susceptible to abuse by the inmate such as selling or sharing, the discontinuation is reviewed by a doctor, and alternative medical treatment is at least considered. *See Quiroga v. Green*, 2014 WL 5471042 (E.D. Cal. October 17, 2014)(morphine discontinued after doctor believed inmate was drug seeking and had a history of cheeking medications but alternative (non-narcotic) medication was prescribed instead); *Reyes v. Grounds*, 2014 WL 2091343 (N.D. Cal May 19, 2014)(morphine discontinued after "cheeking" incident but prescribed alternative pain medications); *Todd v. Bigelow*, 2012 WL 627965 (D. Utah February 24, 2012)(Defendants did not completely withdraw all pain medications but instead tried to offer alternative medications that presented less risk for abuse); *Atakpu v. Lawson*, 2008 WL 5233467, *11 (S.D.Ohio Dec.11, 2008) ("evidence submitted by plaintiff shows that the LECI doctor ordered that the Ultram be discontinued … because of 'cheeking'" but inmate received alternative medications for pain); *Shea v. Wheeler*, 2001 WL 34376846, *6 (W.D.Wis. June 19, 2001) (holding that prison doctor's decision to discontinue inmate's prescription for Ritalin based upon misuse, even after inmate

was found not guilty at a subsequent disciplinary hearing, did not constitute deliberate indifference but there was an understanding that the inmate could ask for a psychiatric evaluation at any time); *Jones v. Ehlert*, 704 F.Supp. 885, 888-890 (E.D.Wis. 1989) (no deliberate indifference found where prisoner's Valium was discontinued after sergeant at correctional institution accused prisoner of palming off medication but inmate was seen daily in the prison outpatient clinic during the week following the discontinuance of his medication and had only been taking the Valium for two weeks).

In Chyatte's case, Defendants discontinued a non-narcotic pain medication, an anti-depressant, and an antacid. There is no indication that the decision to discontinue all medications was reviewed by a doctor, that it was determined to be medically safe, or that any alternatives were considered or offered. Most concerning is Defendants did not address the discontinuation of the anti-depressant. There is no indication in the record of the potential side effects of such a discontinuation but Chyatte testified that following the abrupt cessation of his medications on April 20, 2012 he became very ill, suffered intense, debilitating, physical pain, his joints began to swell dramatically, he broke out in a body-wide skin rashes, he could not sleep, he began to experience auditory and visual hallucinations, he became paranoid, and thought the newspapers were

communicating with him. (Chyatte's Second Declaration, Doc. 59 at ¶¶ 99-106.)

On this record, the Court cannot say that Defendants were not deliberately indifferent to Chyatte's serious medical needs when they abruptly discontinued pain medications and an anti-depressant without consideration of the effects on Chyatte, consideration of alternatives, or follow-up care.

If Spectrum and/or Missoula County had a custom, policy or practice of discontinuing all medications as a consequence for "cheeking" without follow-up or alternative care being offered, there is a genuine issue of material fact regarding whether they violated Chyatte's constitutional rights.

In addition, Chyatte contends Defendants did not address his denial of mental health care claim. Defendants argue that such a claim was not raised. However, in the Amended Complaint, Chyatte alleged that Spectrum's failure to employ a psychiatrist or psychologist was a deliberately indifferent policy. (Amended Complaint, Doc. 9 at 14.) The record is full of examples where Chyatte requested mental health care and Defendants response was that he had to arrange that through his attorney. (Medical Requests, Doc. 59-2 at 2-4.) However, the Court notes that as of August 23, 2012, Chyatte was representing himself in his criminal case. *See Chyatte v. State*, DA 15-0111, Mt.S.Ct., Brief of Appellee filed August 27, 2015 at p. 4. The Court finds that he sufficiently plead a denial of

mental health care claim.

Defendants Stahl, Trudeau, Spectrum, Missoula County, and Kowalski's motions for summary judgment will be denied with regard to Chyatte's claim that he was denied medications from April 20, 2012 through July 20, 2012 and his denial of mental health care claims. The motions will be granted as to Chyatte's claim for denial of medications up until April 20, 2012 and as to Munsell.

## III.    AMERICANS WITH DISABILITIES ACT CLAIM

Title II of the Americans with Disabilities Act of 1990, 42 U.S.C.§ 12101 et seq. (ADA), provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim under Title II of the ADA, the plaintiff must allege four elements:  (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Thompson v. Davis*, 295

F.3d 890, 895 (9th Cir. 2002).

Although § 12132 does not expressly provide for reasonable accommodations, the implementing regulations provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The duty to provide "reasonable accommodations" or "reasonable modifications" for disabled people under Title II of the ADA arises only when a policy, practice or procedure discriminates on the basis of disability. *Weinreich v. Los Angeles County MTA*, 114 F.3d 976, 979 (9th Cir. 1997).

The provisions of the ADA and the Rehabilitation Act apply to law enforcement and correctional facilities. *Lee v. City of L.A.*, 250 F.3d 668, 691 (9th Cir. 2001). The Supreme Court has ruled that a prisoner may state a Title II claim based on "the alleged deliberate refusal of prison officials to accommodate [a prisoner's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs[.]" *U.S. v. Georgia*, 546 U.S. 151, 157 (2006) (noting that plaintiff, a paraplegic prisoner, may be able to state a Title II claim premised, inter alia, on his allegation that he could not turn his

wheelchair around in his cell).

Here, Chyatte claims he was not transported to and from court in a handicap accessible vehicle that sufficiently accommodated his disabilities. Claims based on a municipality's failure to provide appropriate post-arrest transportation for persons with disabilities are cognizable under the ADA. *See, e.g., Gorman v. Bartch*, 152 F.3d 907, 916 (8th Cir. 1998) (wheel-chair bound plaintiff stated a claim under the ADA and Rehabilitation Act against municipality for failure to provide appropriate transportation in police van).

Chyatte presented testimony by declaration that when he arrived at MCDF there was no "ADA-complaint" transportation at MCDF and his requests for ADA compliant transportation were ignored. (Doc. 62 at ¶ 55.) On March 28, 2012, he filed a grievance complaining that the lack of handicap accessible transportation caused him pain and injury. (Doc. 62 at ¶ 57; March 28, 2012 Grievance, Doc. 62-1 at 13.) Captain Kowalski denied the grievance on June 17, 2012 citing "no attempt at informal resolution." Chyatte appealed the grievance on June 18, 2012 but received no response.

Chyatte alleges MCDF transported him in non-handicap accessible vehicles on February 7, 2012, February 28, 2012, March 29, 2012, April 24, 2012, May 1, 2012, May 8, 2012, May 29, 2012 and March 13, 2013. (Doc. 62 at ¶ 65.) These

dates correspond with the transportation log produced by Defendants. (Doc. 46-2 at 1.) In his Amended Complaint, Chyatte alleges, "[t]o load Chyatte into the transport vans MCDF officers would pick Chyatte up and throw him into the transport van. This experience is painful and degrading for Chyatte, and aggravates his Arthritis causing further loss of range of motion." (Amended Complaint, Doc. 9 at 5.)

Chyatte filed another grievance on July 28, 2012. On July 30, 2012, Chief Detention Officer Mark Foss granted the grievance and agreed that MCDF would provide him with handicap-accessible transportation from that point forward. MCDF contracted with Medi-Cab to transport wheelchair-bound inmates on June 4, 2012. On August 7, 2012 and August 9, 2012, Medi-Cab was not available and Chyatte made his court appearance via video-court. (Doc. 62 at ¶ 70.) After he was convicted and sentenced, he was, however, transported to Montana State Prison in a non-handicapped accessible vehicle. (Doc. 62 at ¶ 71.)[7]

Chyatte has presented sufficient evidence to create a genuine issue of material fact regarding whether Defendants' actions violated the ADA. And if the Defendants did, it must be determined what relief is available to Chyatte. Title II

_____

[7]Chyatte testified in his deposition that he was transported to MSP in a police cruiser. (Deposition, Doc. 43-3 at 6–deposition page 60, lines 6-10.)

of the ADA adopts the remedies provision of the Rehabilitation Act, 29 U.S.C. §

794a, which in turn adopts the remedies provision of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000d et seq.  In *Duvall v. County of Kitsap*, 260 F.3d

1124 (9th Cir. 2001), the Ninth Circuit stated that "[t]o recover monetary damages

under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove

intentional discrimination on the part of the defendant."  *Duvall*, 260 F.3d at 1138

(*citing Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998) (footnote

omitted)).  The Court held that deliberate indifference is the appropriate standard

to use in determining whether intentional discrimination occurred.  *Id.*  "Deliberate

indifference requires both knowledge that a harm to a federally protected right is

substantially likely, and a failure to act upon that likelihood."  *Id.* at 1138 (*citing*

*City of Canton v. Harris*, 489 U.S. 378, 389 (1988)).  In order to meet the second

element of the deliberate indifference test, a failure to act must be the result of

conduct that is more than negligent and involves an element of deliberateness.  *Id.*

at 1139.

The record reflects that in 2012 Chyatte was able to ambulate with a cane

and he admitted in his deposition that he could stand and brace on things.

(Deposition, Doc. 43-3 at 6, deposition page 61, line 18.)  Chyatte has failed to

establish that a genuine issue of material fact exists as to whether he was

completely unable to get into a vehicle, was paralyzed or completely unable to move or at least get into a vehicle with assistance. Chyatte has simply not come forward with sufficient evidence establishing the existence of genuine issue of material fact as to whether Defendants were deliberately indifferent to Chyatte's need for accommodations. To the contrary, MCDF worked to resolve the issue by contracting with a company to provide handicap accessible transportation. Consequently, the Defendants are entitled to summary judgment with respect to Chyatte's claim for monetary damages under the ADA.

To the extent the Amended Complaint can be read as seeking injunctive relief, the claim is moot because MCDF has contracted with a company to provided transportation services for inmates in wheelchairs and Chyatte is no longer incarcerated at MCDF. *Dilley v. Gunn*, 64 F.3d 1365, 1368–69 (9th Cir. 1995)(when an inmate has been transferred to another prison and there is no reasonable expectation nor demonstrated probability that he will again be subjected to the prison conditions from which he seeks injunctive relief, the claim for injunctive relief should be dismissed as moot.)

Missoula County's Motion for Summary Judgment will be granted as to Chyatte's ADA claim. While there may be a genuine issue regarding whether there was a technical violation of the Act, Chyatte is not entitled to injunctive or

monetary damages.

## IV. CONSTITUTIONAL CLAIMS

Defendants argue they are entitled to qualified immunity for their actions. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In determining whether an officer is entitled to qualified immunity, the court must decide (1) whether facts alleged or shown by plaintiff make out a violation of constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct.  *Pearson*, 555 U.S. at 232 (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.  In resolving these issues, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

The Court will first examine whether Chyatte has shown that any individual Defendant violated a constitutional right with regard to the July and September

2012 incidents and if s o whether those rights were clearly established at the time of the incident. The Court will then examine the liability of Missoula County.

## A. July 2012 Incident

Count II of Chyatte's Amended Complaint raises claims of conditions of confinement and excessive use of force in violation of the due process clause of the Fourteenth Amendment against Defendants Missoula County, Harris, Tackett, and Jensen.[8] The Court views the facts and inferences from them in the light most favorable to Chyatte as the non-moving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 474 U.S. 574, 587-88 (1986). In his statement of disputed facts, Chyatte explains the incident in July 2012 as follows: On July 13, 2012, Chyatte and five other inmates complained that MCDF refused to provide medical and mental health care to inmates. Chyatte and these other inmates did not threaten violence, did not destroy property, and did not threaten to destroy property. Defendants presented evidence that Chyatte and the other inmates refused to lock down but in a non-violent manner.

Shortly after this incident, a Disturbance Response Team (DRT) was sent into the pod. Chyatte alleges this team threatened to shoot them with a bean-bag

---

[8]Defendant Jensen did not waive service (See Doc. 15) and has not been otherwise served. Defendant Jensen will be dismissed.

cannon and/or deploy stun grenades. Chyatte and the other five inmates were then moved from their unit without further incident.

Chyatte was moved to a solitary confinement cell that was not handicap-accessible and his wheelchair became wedged between the cell's door and the toilet. Chyatte notified the officers but was told to "deal with it." The officers then turned off the lights in Chyatte's cell leaving him wedged between the door and toilet, unable to move, in complete darkness. Around midnight Chyatte flooded the cell using the toilet. He was then moved to a new cell that was handicap accessible. Defendants allege that Chyatte flooded this second cell as well. Chyatte denies this allegation. He contends he was moved to a third cell because the commotion caused by the DRT team had woken and agitated a severely mentally ill man who began cursing Chyatte.

Regardless, Chyatte alleges that after being moved to a third cell he began to experience symptoms of psychosis because he had been off his mental health medications for several months. Convinced that MCDF officers were using the camera in the cell to steal and record his thoughts, Chyatte covered the camera with toilet paper. In response, MCDF officers turned off the water to Chyatte's cell and advised him the water would remain off until he uncovered the camera. In a psychotic state and fearing for his safety, Chyatte did not uncover the camera for

the rest of the night.  During this time, he requested and was refused drinking water.  Chyatte asserts that sometime the next morning Sgt. Stewart brought a group of officers to Chyatte's cell door and threatened to shoot Chyatte with a taser unless he placed his hands through the food-hatch of the cell door.  Chyatte claims he complied and Stewart handcuffed him to the cell door, then yanked the door open with Chyatte chained to it causing him substantial pain.[9]  Officers then entered the cell and removed the toilet paper.

Chyatte alleges he again asked for drinking water and asked to speak with a mental health professional but Stewart and the other officers ignored his requests. Chyatte was returned to his cell with his water remaining off.  Purportedly still in a psychotic state, Chyatte continued to believe the in-cell camera was a threat and therefore threw his feces at the camera.  Accordingly to Chyatte, Officer Jackson came to the door, taunted him, denied his request for water and mental health care, and advised him he would not be given drinking water until he uncovered the camera.  Chyatte claims he continued to request drinking water but to no avail.

At some point, Supervising Officer Tackett told Chyatte that if he would

---

[9]Stewart's incident report indicates that "Chyatte placed his hands through the food hatch.  I [Stewart] placed on [sic] set of handcuffs around his left writs and secured the other end to the cell door handle.  Officer Jackson gave me a set of handcuffs which I placed on both wrist of inmate Chyatte.  Once secured I had the door opened and inmate Chyatte rolled out with the door."

clean the feces from the camera and the wall he would receive drinking water but Chyatte did not comply. Chyatte asserts that in all he was denied drinking water from approximately 2:00 a.m. on July 14, 2012 until 12:45 p.m. on July 15, 2012. (Chyatte's Statement of Disputed Facts (SDF), Doc. 61 at 16-21.)

Defendants have presented somewhat conflicting testimony stating that although Chyatte's water was initially turned off, it was turned back on sometime prior to 7:00 a.m. but then was turned off again after Chyatte allegedly flooded the second cell. Stewart testified that during the referenced time Chyatte was placed on sack lunches and given an hour out of his cell when he requested it. (Stewart Aff, Doc. 45 at 6, ¶ 24.)[10] Stewart also testified that Chyatte was offered drinking water throughout the day of July 14 (Stewart Aff, Doc. 45 at 6, ¶ 25) but there is no indication of this on the MCDF activity logs for July 14 and 15, 2012.[11]

---

[10]Although Stewart's Affidavit indicates Chyatte was given an hour out and the pass down log indicates that Chyatte requested an hour out (Doc. 45-2 at 2), there is nothing in the July 14, 2012 Activity log to indicate that Chyatte was given an hour out. The Log does make note of each time other inmates were given an hour out.

[11]Chyatte makes general allegations of being denied food and mental health care but in his Amended Complaint, his statement of disputed facts and in his declaration there is no statement regarding being denied food during this incident. There is an indication on the Commander's Log (Doc. 44-3 at 4) that Chyatte threw his food tray at lunch on July 14, 2012 (which Chyatte denies) and he did not receive dinner because there was a large amount of feces on the food hatch. *Id.* The Court has limited its examination of this claim to Chyatte's allegation that he

Stewart also testified that at 9:00 a.m. on July 15 Chyatte's running water was turned on for 20 minutes to allow the cell to be cleaned.  (Activity Log, Doc. 45-5 at 1.)  Chyatte's sink water was turned on at 9:36 a.m. on July 15, 2012.  (Activity Log, Doc. 45-5 at 2.)   He was moved to a different cell at 12:45 p.m. on July 15 and at 1:30 p.m. was allowed an hour out and allowed to shower at 1:24 p.m..  Chyatte refused all three meals on July 15.  (Pass Down Log Unit 2, Doc. 45-6.)

With respect to a pretrial detainee's conditions of confinement claim under the Fourteenth Amendment, the Ninth Circuit applies the standard set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994).  *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1243 (9th Cir. 2010)(noting that neither the Ninth Circuit "nor the Supreme Court have departed from the standard set forth in *Bell* and *Farmer* for considering pretrial detainees' claims that government officials violated their Fourteenth Amendment rights by failing to prevent harm"); *Castro v. County of Los Angeles*, ___ F.3d ___, 2015 WL 4731366 (9th Cir. August 11, 2015)(*Clouthier* remains good law after *Kingsley v. Hendrickson*, ___ U.S. ___, 135 S.Ct. 2466, ___ L.Ed.2d ___ (June 22, 2015)).

The Constitution does not mandate that prisons be comfortable.  *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).  Nor does it require correctional facilities to

---

was denied drinking water for 37 hours.

provide every amenity that a prisoner might find desirable. *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982). But the Constitution will not permit inhumane prison conditions. *See Farmer*, 511 U.S. at 832. "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). "The circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred. 'The more basic the need, the shorter the time it can be withheld.' " *Id.* (*citing Hoptowit*, 682 F.2d at 1259).

Defendants argue that the standard set forth in *Whitley v. Albers*, 475 U.S. 312 (1986) applies because this situation involved a disciplinary action necessary to maintain the safety and security of the institution. The *Whitley* court held that in a situation where prison officials are attempting to restore discipline and order in the facility, the standard is whether or not the officials acted "maliciously and sadistically for the very purpose of causing harm." *Id.* at 320-321.

There are several problems with Defendants' argument. First, this is a conditions of confinement claim, not a claim of excessive force as in the *Whitley* case. Second, Chyatte was confined in his cell and the only disciplinary concerns were that he was covering his camera and window. This is not a situation where a

riot was ongoing as in *Whitley*.  Third, Chyatte was a pretrial detainee, not a

convicted prisoner.  As the United States Supreme Court recently stated, the

*Whitley* case involved,

> excessive force claims brought by convicted prisoners under the
> Eighth Amendment's Cruel and Unusual Punishment Clause, not
> claims brought by pretrial detainees under the Fourteenth
> Amendment's Due Process Clause.  The language of the two Clauses
> differs, and the nature of the claims often differs.  And, most
> importantly, pretrial detainees (unlike convicted prisoners) cannot be
> punished at all, much less "maliciously and sadistically."

*Kingsley*, 135 S.Ct. at  2475.

The Court appreciates the "practical importance of taking into account the

legitimate safety-related concerns of those who run jails" *Id.*, but under no

circumstances would Defendants be allowed to punish Chyatte.  The *Whitley*

standard does not apply to Chyatte's conditions of confinement claim.

Chyatte testified that he was denied drinking water for approximately 34

hours.  Although there is some indication in the record that the water was turned

on for a brief period of time at 9:00 a.m. on July 15, 2012, that would still be 31

hours without drinking water.  There is a genuine issue of material fact regarding

whether Defendant Tackett was deliberately indifferent to Chyatte's basic human

needs July 14, 2012 to July 15, 2012.

Chyatte alleges Jail Manager Harris responded to Chyatte's grievance after

36

this incident stating, "DOII Tackett was only trying to get you to clean feces from the window of your cell" maintaining that the deprivation of water was justified. Jail Manager Harris is a supervisory official at MCDF. In limited circumstances a supervisor's subsequent "ratification" of another's conduct can form the basis for liability under § 1983. *See Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991); *Logan v. City of Pullman Police Dept.*, 2006 WL 1148727, *2 (E.D. Wash. 2006) (*citing Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003), rev'd on other ground, 543 U.S. 194 (2004)). The decision to ratify specific conduct, however, must approve both the subordinate's decision and the basis for it, and the ratification decision must be "the product of a 'conscious, affirmative, choice' to ratify the conduct in question." *Haugen*, 351 F.3d at 393. It must be a decision to ratify unconstitutional conduct. *Logan*, 2006 WL 1148727, *4. Importantly, the circumstances of the ratification must also demonstrate that the supervisor had previously set in motion acts of others which caused the others to inflict a constitutional injury. *Larez*, 946 F.2d at 645–46. There is a genuine issue of material fact regarding the liability of Jail Manager Harris.

### B.  September 2012 Incident

#### 1.  Failure to Exhaust

Chyatte alleges he was placed on suicide watch after the September 19,

2012 incident and was denied access to grievances. After he was released from suicide watch, he states he filed a grievance regarding the use of force on September 19, 2012 but it was ignored. Defendants retort that Chyatte failed to exhaust his administrative remedies regarding his September 2012 excessive force claim. Thus, there is a genuine issue of material fact regarding whether or not Chyatte grieved this issue. The motion for summary judgment will not be granted on these grounds.

### 2. Facts

Many of the facts relating to the September 19, 2012 incident are undisputed. For example, Chyatte does not dispute Defendants' evidence that Chyatte started the day by again covering his camera and cell door with paper inhibiting officers from visually observing Chyatte in his cell. During breakfast pass, Chyatte started throwing paper into the dayroom and yelling at officers. Later, Defendant Stewart states that Chyatte defecated on the floor and smeared the feces over the camera and the cell door windows thus obscuring the officers view of Chyatte. Chyatte does not dispute these allegations in his statement of disputed facts.

At approximately 1:00 p.m., Officer Lee-Rye informed Stewart that he believed Chyatte was going to harm himself. In his declaration, Chyatte stated he

did not believe he threatened self-harm (Declaration, Doc. 62 at ¶ 125), but later admitted in his deposition that he may not recall threatening to harm himself. (Deposition, Doc. 66-3 at 2, deposition page 84, lines 19-22.)  In light of the threat to harm himself and because the officers could not monitor the cell because the camera and window were covered in feces, Stewart and five other officers gathered outside Chyatte's cell to conduct a cell extraction.  According to Defendant Stewart's incident report the officers entered the pod at approximately 2:00 p.m., instructed Chyatte to come to the food hatch to "cuff up" three to four times but received no response.  Stewart then deployed OC spray into the cell. After about 5 to 10 seconds, Stewart states that Chyatte said he was done and coming to the cell door.  Chyatte stuck his hands through the food hatch on his cell door and he was again chained to the cell door.  He claims he was dragged through the cell door when it was jerked open which caused him great pain.[12]

After Chyatte was outside the cell, but before he was decontaminated from the OC spray, he was placed in a restraint chair and a spit hood was placed over his head.  Chyatte contends, and it is not disputed by Defendants, that he never

---

[12]Officer Wilson, one of the officers assisting Stewart in removing Chyatte from his cell, stated in a supplemental report that after handcuffs were placed on Chyatte, he retained a grip on the handcuffs and the cell door was opened. Chyatte was secured in the restraint chair and a spit hood was placed on him. (Doc. 45-8 at 1.)

attempted to spit on the officers, he did not threaten to spit on the officers, he did not act aggressively toward the officers, and he did not threaten the officers.

Officers then wheeled Chyatte in the restraint chair to the vehicle sally port and began to spray him with a hose but left the spit hood on his head. Chyatte alleges he screamed several times that he could not breathe because the hood was filling with water.[13] Chyatte contends the officers repeatedly submerged his head under water until one officer said: "That is enough" and pulled the bag away from his nose and mouth.

Chyatte was subsequently taken to the booking area of MCDF, where two officers came to dry him off and lift him from the restraint chair because he was purportedly too weak and exhausted to stand. But according to Chyatte, when the two officers tried to put him in dry clothes, Captain Kowalski ordered them to leave him in the wet clothes and place the spit hood back over his nose and mouth. Chyatte contends an attending nurse wanted him taken from the restraint chair

---

[13]Officer Vaughn's statement seems to corroborate Chyatte's allegation that the officers began to spray him with water while the spit hood was still on his head. Vaughn's statement says, "[i]n the sally port the water was turned on and Inmate Chyatte said he did not want to go under the water. Officer Wilson advised him that he needed to go under the water to wash all of the OC spray off. As the water cascaded over Inmate Chyatte he yelled that he could not breath. We removed the spit hood he was wearing so he would not feel as though he could not breath." (Doc. 45-8 at 3.)

because of his blood pressure and the fact his lips were blue and he was shivering, but that Kowalski refused to allow him to be released from the restraint chair. Chyatte alleges he was left chained to the restraint chair, in wet clothes, with a bag over his head from approximately 12:00 p.m. until after 7:00 p.m. or at least seven and a half hours. According to Officer Lee-Rye's supplemental report, Chyatte was placed in the restraint chair at 2:03 p.m. (Doc. 45-8 at 4) which coincides with the time of the cell extraction as indicated in Stewart's incident report (Doc. 45-7.) According to Defendants' restraint log, Chyatte was removed from the chair at 7:10 p.m.. (Doc. 45-9 at 2.)[14]

Chyatte alleges that after being released from the restraint chair he was in pain, could not move his arms, and had pain and stiffness in his back. Throughout his time in the restraint chair, he claims did not threaten the officers or act aggressively toward them.

### 3. Standard

Defendants point out that the Ninth Circuit looks at both the due process clause and the Fourth Amendment in reviewing claims by pre-trial detainees.

---

[14]Defendants argue that Chyatte was only in the restraint chair for four hours based on the 10 minute restraint log which begins at 2:40 p.m. But the undisputed evidence indicates Chyatte was placed in the restraint chair immediately after the 2:00 p.m. cell extraction.

(Msla Brief, Doc. 42 at 12, n.2.)  After completion of briefing in this case, the United States Supreme Court clarified in *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (June 22, 2015) that pretrial detainee suits for excessive force arising under the Fourteenth Amendment are properly analyzed using an objective, not subjective, standard.  Specifically, the Supreme Court held "that a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2473.  Whether the Court applies the Fourteenth Amendment standard or the Fourth Amendment standard, the outcome is now the same—Chyatte's claim is to be analyzed using an objectively reasonable standard, without regard to the subjective intent of the Defendants.  In light of *Kingsley*, under either amendment, the court would employ the same objective test for Chyatte's claims. *Id.* at 2472–73.

Therefore, in order to establish excessive force, a pretrial detainee must show that the force purposely or knowingly used against him was objectively unreasonable. *Kingsley*, 135 S.Ct at 2473.  A court cannot apply this standard mechanically. *Id.* "Rather, objective reasonableness turns on the facts and circumstances of each particular case." *Id.* (citation and internal quotation marks omitted).  "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not

with the 20/20 vision of hindsight." *Id.* "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.' " *Id.* (*quoting Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

"Considerations bearing on the reasonableness or unreasonableness of the force used include:  the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 135 S.Ct 2473.  The Supreme Court held that this list is not meant to be exhaustive and is merely illustrative of the types of objective circumstances potentially relevant to a determination of excessive force. *Id. Kingsley* also reaffirms that pretrial detainees cannot be subjected to "the use of excessive force that amounts to punishment," *id.* (*quoting Graham*, 490 U.S. at 395 n. 10) precisely because they "cannot be punished at all." *Id.* at 2475.

In light of this standard and the facts taken in the light most favorable to

Chyatte, the excessive force claims with regard to the incident on September 19, 2012 will proceed. Taking the largely undisputed facts in the light most favorable to Chyatte, he had been taken off all medication including but not limited to an anti-depressant for five months. This was the second incident in which he was acting out by defecating in his cell and using his own feces to cover the camera and windows. Chyatte contends he was experiencing psychosis. Defendants never provided Chyatte with any mental health treatment during this period of time. The apparent reason for the cell extraction was because Chyatte threatened to harm himself and the officers could not watch him. Although Chyatte initially was non-compliant by not coming to the cell door to cuff up as instructed, after the initial use of OC spray, there is no indication that he resisted in anyway. Despite the stated purpose for the cell extraction (protection from self harm), Chyatte was strapped to a restraint chair. Despite his not spitting or attempting to spit on anyone, a spit hood was placed over his head after he was contaminated with OC spray. Despite the stated purpose of spraying Chyatte to decontaminate him from the pepper spray, the officers sprayed him down with the spit hood on so that he could not breathe. Aside from the initial use of OC spray, there appears to be little need for the use of force and the force utilized (five hours in a restraint chair, a spit hood, and sprayed with water with a spit hood) seems extreme.

Chyatte testified that his body was in extreme pain after being left in the chair for so long, he could not breathe, and could not move his arms. A reasonable juror could conclude that these actions were done to punish Chyatte for messing up his cells. Any form of punishment on a pretrial detainee is unconstitutional. *Kingsley*, 135 S.Ct at 2473. There are genuine issues of material fact regarding whether or not Defendants violated Chyatte's clearly established constitutional rights during the September 19, 2012 incident. It was clearly established in 2012 that officers may not punish pretrial detainees. The facts strongly suggest that this is what was done to Chyatte. Therefore, the individual defendants are not entitled to qualified immunity and their motion for summary judgment will be denied.

### 4. Missoula County

Municipalities may be held liable as "persons" under 42 U.S.C. § 1983, but not for the unconstitutional acts of their employees based solely on respondeat superior. *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 691 (1978). Rather, a plaintiff seeking to impose liability on a municipality under § 1983 is required "to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (*citing Monell*, 436 U.S. at 694; *Pembaur v. Cincinnati*, 475 U.S. 469, 480–81

(1986); and *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).  Thus, to state a

claim under Section 1983, a plaintiff must allege:  (1) that the plaintiff possessed a

constitutional right of which he was deprived; (2) that the municipality had a

policy; (3) that this policy amounts to deliberate indifference to the plaintiff's

constitutional rights; and (4) that the policy is the moving force behind the

violation.  *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th

Cir. 1997).  A *Monell* claim can take one of three forms:  (1) when official policies

or established customs inflict a constitutional injury; (2) when omissions or

failures to act amount to a local government policy of 'deliberate indifference' to

constitutional rights; or (3) when a local government official with final

policy-making authority ratifies a subordinate's unconstitutional conduct.

*Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010)).

Chyatte presented two situations wherein he, as an individual with mental

health issues, was mistreated allegedly based upon his mental health problems.  He

also presented a number of other incidents in which other inmates with mental

health problems were abused and/or mistreated while in MCDF.  (Declaration,

Doc. 62 at ¶¶ 160-180.)  In addition, he has presented evidence that the County did

not employ or contract with a mental health professional for the treatment of

inmates with mental health inmates and in Chyatte's case they discontinued mental

46

health medications without consulting a mental health professional or possibly even a doctor. There is a genuine issue of material fact regarding whether Missoula County had a custom, policy or practice of mistreating inmates with mental health problems.

Missoula County also argues that it is entitled to qualified immunity. (MSJ, Doc. 42 at 12.) It is well established that qualified immunity is not available to municipalities. *Owen v. City of Independence*, 445 U.S. 622, 657 (1980). The County's motion for summary judgment will be denied.

## V. MOTION TO COMPEL

On October 21, 2014, this Court issued a Scheduling Order requiring all motions to be fully briefed on or before May 1, 2015. (Doc. 21.) As such, any motion to compel would have had to have been filed at least fourteen days prior to that deadline or at the very latest April 17, 2015. Chyatte's motion to compel was not filed until April 30, 2015.

Chyatte did not obtain leave of Court to amend the scheduling order upon a showing of "good cause" as required under Fed. R. Civ. P. 16(b)(4). *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-09 (9th Cir. 1992)). Additionally, the Scheduling Order entered October 21, 2014, provides that a continuance of the

"deadlines will not be granted, absent compelling reasons[]" which Chyatte has not presented. (Doc. 21 at 2.) Therefore, his motion is untimely and will be denied.

## VI. ELECTRONIC FILING

On July 17, 2015, Chyatte wrote a letter to the Clerk of Court inquiring whether he has to provide a paper copy of his filings to all the parties given that his documents are electronically filed with the Court. The Court will allow the parties an opportunity to object to his request and if no objection is made, Chyatte may complete service of his documents by serving them on the Clerk of Court only.

Based upon the foregoing, the Court issues the following:

### ORDER

1. The Spectrum Defendants' Motion for Summary Judgment (Doc. 36) is granted as to FNP Munsell and as to Chyatte's claims of denial of Celebrex and other medications from February 3, 2012 until April 20, 2012. The motion is denied as to Defendants Spectrum Medical, Tim Stahl, and PA-C Trudeau on all other claims.

2. The Missoula County Defendants' Motion for Summary Judgment (Doc. 41) is granted as to Chyatte's ADA claim and his claim that he was denied

Celebrex and other medications from February 3, 2012 until April 20, 2012. The motion is denied as to all other claims.

3. Chyatte's Motion to Compel (Doc. 54) is denied.

4. Defendant Jensen is dismissed because he has never been served in this action.

5. **Unless Defendants object within seven (7) days of the date of this Order**, Chyatte need not serve on Defendants' counsel the materials he files with the Court because Defendants' counsel will be served via the electronic filing system. Chyatte will, however, be required to serve all other documents not filed with the Court upon counsel by first-class mail. Defendants must, however, serve on Chyatte a complete copy of everything it submits to the Court.

DATED this 21st day of September, 2015.


     */s/ Jeremiah C. Lynch*                
Jeremiah C. Lynch
United States Magistrate